1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9

10

11

12

13

14

15

| | |
|---|---|
| BERNARD J. MATTER,<br><br>                              Plaintiff,<br><br>       v.<br><br>WASHINGTON DEPARTMENT OF<br>CORRECTIONS, PAT GLEBE, SARA<br>SMITH, NORM GOODENOUGH,<br>CLIFFORD JOHNSON, ELIZABETH<br>SUITER, LARA STRICK, BARBARA<br>CURTIS, J. DAVID KENNY,<br><br>                              Defendants. | No. C13-5213 BJR-KLS<br><br>**REPORT AND RECOMMENDATION**<br>**Noted for:  August 29, 2014** |

16

17

18

19

20

        Defendants Washington Department of Corrections (DOC), Pat Glebe, Sara Smith, Norm

Goodenough, Clifford Johnson, Elizabeth Suiter, Lara Strick, Barbara Curtis, and J. David

Kenney move for summary judgment on Plaintiff Bernard J. Matter's claims against them.  Dkt.

28.  The Court recommends that the motion be granted.

21

**BACKGROUND**

22

23

24

25

26

        Mr. Matter filed an amended complaint against the Defendants regarding his medical care

while he was incarcerated at the Stafford Creek Corrections Center (SCCC).  Dkt. 7.  Before his

incarceration, Mr. Matter was receiving a 24 week treatment regimen for Hepatitis C while in the

community.  *Id.*, p. 8.  After 14 weeks of treatment, his viral load had dropped to zero and his

REPORT AND RECOMMENDATION - 1

provider decided to maintain Mr. Matter on the treatment program. *Id.* However, during the course of treatment, Mr. Matter was arrested and pled guilty to criminal charges. *Id.*, pp. 8-9. Mr. Matter alleges that the Defendants failure to continue his Hepatitis C treatment regimen constitutes discrimination in violation of the Americans with Disabilities Act (ADA) under 42 U.S.C. § 12132 and the Washington Law Against Discrimination (WLAD) under RCW 49.60 and violates the Eighth and Fourteenth Amendments of the U.S. Constitution pursuant to 42 U.S.C. § 1983. *Id.*, pp. 22-13. Mr. Matter requests judgment, injunctive and monetary relief. *Id.*, p. 13.

Mr. Matter did not file any pleadings in response to the Defendants' motion. Therefore, the statement of facts were taken from the sworn declaration of Dr. John David Kenney.

## STATEMENT OF FACTS

Dr. John David Kenney reviewed Mr. Matter's medical records. Dr. Kenney is the Medical Director at Large for the DOC. He oversees the overall quality, safety, and appropriateness of medical care provided to incarcerated offenders/patients in the DOC and develops policy, procedures and guidelines to ensure these standards are met. As DOC's Medical Director at Large, he serves as an alternate chair the DOC Medical Care Review Committee (CRC) and is a voting member of the CRC. He is currently serving as the Acting Facility Medical Director at the SCCC. Dkt. 28-1, Exhibit 1, Declaration of John David Kenney, M.D., ¶¶ 1-2. Dr. Kenney also serves as the correctional medical expert in agency investigations and responds to Level 3 grievances related to medical issues. In this capacity, he does not have the authority to approve or deny treatment. His response is limited to a review of the Level 1 and Level 2 responses to ensure that procedurally (under the Offender Health Plan and DOC policies), the offender's grievance was adequately investigated and the concern or issue was

REPORT AND RECOMMENDATION - 2

addressed.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 3.

Dr. Kenney is familiar with Mr. Matter from review of his medical files.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 11.  Dr. Kenney's review of records indicates that Mr. Matter was receiving Hepatitis C treatment at the time of his arrest.  However, by the time he came into DOC custody after his initial jail stay, he had a significant interruption in his treatment regimen.  According to Dr. Kenney, resuming treatment is not without risk.  Therefore, when Mr. Matter had an examination on May 4, 2011 and May 27, 2011, the medical provider noted he would need to be re-evaluated through the DOC Hepatitis C protocol prior to resuming any treatment.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 12; Attachment B.

Mr. Matter was seen thereafter in medical for various other issues.  On July 8, 2011, Mr. Matter met with a medical provider to discuss his lab results related to other medical complaints.  Mr. Matter's history of Hepatitis C was discussed and he informed the provider that he would like to restart the treatment he was receiving prior to his arrest.  The provider informed the Infection Control Nurse, Eschbach and requested that she discuss treatment with him.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 13; Attachment C.

On August 10, 2011, Mr. Matter met with Nurse Eschbach to discuss his Hepatitis C treatment.  Mr. Matter indicated that he wanted to continue with the treatment if it was necessary.  On September 2, 2011, Nurse Eschbach noted current lab work indicated a return of the virus.  Nurse Eschbach informed Mr. Matter that his next step would involve clearance by a mental health treatment provider.  After clearance from the mental health treatment provider, on October 20, 2011, Nurse Eschbach referred Mr. Matter for HCV related lab work.  On November 3, 2011, Mr. Matter met with Nurse Eschbach to discuss his lab results which confirmed he was

REPORT AND RECOMMENDATION - 3

Hepatitis C positive.  Mr. Matter was then referred to Dr. Smith for an examination.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 14; Attachment D.

On December 15, 2011, Dr. Sara Smith conducted an examination of Mr. Matter and recommended referral to Hep C CRC.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 11; Attachment E.

According to Dr. Kenney, DOC Policy 670.000, Communicable Disease, Infection Control and Immunization Program, provides that offenders diagnosed with a communicable disease, like Hepatitis C, receive prompt care and treatment as outlined in the Offender Health Plan, DOC Policy and other recognized standards and guidelines. DOC prison intake procedure, which is applicable to each offender entering DOC, includes questions that identify Hepatitis C Virus (HCV or Hep C) infection risk.  Identified HCV infection risk prompts Hep C evaluation.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 4.  Hep C evaluation is completed according to the Hepatitis C Protocol.  The Hepatitis C Protocol takes a step wise approach to evaluation to ensure all medical factors relevant to treatment are considered before treatment is started.  *Id.,* Exhibit 1 (Kenney Decl.), ¶ 5; Attachment A.

Dr. Kenney explains that the Hepatitis C Care Review Committee (Hep C CRC), chaired by the DOC Infectious Disease Specialist physician and comprised of medical practitioners and infection control nurses among others, reviews proposed and current Hepatitis C treatment statewide.  Factual information regarding individual cases proposed for treatment is presented to the group.  This information may include known facts regarding virologic response to treatment, retreatment risks, potential side effects of treatment (which can be significant and involve physical and mental health related factors), predictors of sustained virologic response, viral response rates, progression towards cirrhosis (determined by liver biopsy), general health, lab test results, results of physical examination, mental health evaluations, changes in health status

REPORT AND RECOMMENDATION - 4

1    and any other relevant information.  Any treatment plan determined to be medically necessary by

2    the committee can be incorporated into the standard DOC Hepatitis C protocol.  Additionally, the

3    Hep C CRC discusses any issue pertinent to patients with HCV including complications of

4    treatment experienced by those currently undergoing HCV treatment.  *Id.*, Exhibit 1 (Kenney

5    Decl.), ¶ 5.

6            Hepatitis C virus (HCV) infection can result in both acute and chronic hepatitis.  The

7    acute process is most often asymptomatic; if symptoms are present, they usually abate within a

8    few weeks.  Acute infection rarely causes liver failure.  The majority of patients with acute HCV

9    fail to spontaneously clear the virus and develop chronic HCV over a period of decades.  HCV

10   affects the liver and the likelihood of progression to cirrhosis of the liver is important because

11   complications of HCV are mostly confined to patients who have developed cirrhosis.  Cirrhosis

12   is a slowly progressing disease in which healthy liver tissue is replaced with scar tissue (fibrosis),

13   eventually preventing the liver from functioning properly.  The scar tissue blocks the flow of

14   blood through the liver and disrupts many normal liver functions including detoxification of

15   waste, hormone production, plasma protein synthesis and the production of bile.  However, not

16   all patients with HCV progress to cirrhosis and in those that do, the rate of progression varies.

17   *Id.*, Exhibit 1 (Kenney Decl.), ¶ 6.

18           Alcohol promotes the progression of chronic HCV even in patients with relatively low

19   alcohol intake.  Alcohol increases HCV replication and has also been linked to the acceleration

20   of liver fibrosis.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 7.  While not synonymous with the term

21   cirrhosis, the best clinical predictor of disease progression in chronic HCV infection is the

22   amount of inflammation and fibrosis on liver biopsy:

23

24

25

26

REPORT AND RECOMMENDATION - 5

- Patients with mild chronic hepatitis have only a 1.2 percent annual risk of progressing to cirrhosis
- Patients with moderate chronic hepatitis have a 4.6 percent annual risk of developing cirrhosis (within 20 years of the time of the biopsy)
- Patients with severe chronic hepatitis usually develop cirrhosis within 10 years

*Id.*, Exhibit 1 (Kenney Decl.), ¶ 8.

Before treating HCV, physicians weigh the benefit of treatment versus the risk of treatment for the patient.  For example, lesser grades of fibrosis are unlikely to rapidly progress towards significant cirrhosis in the near term.  For patients who have failed treatment previously or had a treatment regimen interrupted, retreatment or resuming treatment may prejudice the patient against a successful outcome at a later date with a more effective agent or different treatment regimen than is currently available.  That is, multiple treatment failures reduce the expectation that treatment will be successful at any point with any agent.  Since the disease is only very slowly progressive, it is wise to remain vigilant for any liver compromise and treat when the patient may gain maximum benefit from a treatment that by itself has associated risks and adverse effects.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 9.

The DOC HCV Treatment Program has evolved continuously from its inception to maintain currency with the most up to date evidence based treatments for the disease.  Treatment can be complex and involve the input and supervision of many health care professionals including psychiatrists, physicians (including an infectious disease specialist), nurses and infection control nurses, lab technicians, outside radiologists or surgeons.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 10.

On January 10, 2012, Mr. Matter's case was presented to the Hep C CRC for review and discussion.  Dr. Kenney surmises that Mr. Matter likely had a blood test which determined he

REPORT AND RECOMMENDATION - 6

had Stage 3 or 4 (moderate to severe) fibrosis before he entered the DOC.  However, according to Dr. Kenney, a liver biopsy with microscopic evaluation of that biopsy is considered to provide a more accurate and descriptive diagnosis than currently available blood test estimations of fibrosis.  Liver biopsy is the DOC standard for degree of fibrosis determinations.  Therefore, the Hep C CRC determined that a liver biopsy was necessary to document quantitatively the degree of liver fibrosis and assess rate of disease progression.  If the liver biopsy indicated Mr. Matter's fibrosis was a Stage 3 or 4, treatment would be resumed.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 16; Attachment F.

On February 2, 2012, Dr. Smith met with Mr. Matter to discuss the Hep C CRC's recommendation.   Mr. Matter was offered a liver biopsy with the understanding that if the biopsy revealed Stage 2 (mild-moderate) or lower of fibrosis, there would be no further treatment ordered.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 17; Attachment G.

On March 9, 2012, Mr. Matter was sent to the Harbor Surgical Associates for a liver biopsy. Plaintiff's biopsy results indicated that he had Stage 2 fibrosis, therefore treatment was deemed not medically necessary and was not resumed.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 18; Attachment H.  The pathology report of March 12, 2012, indicated that the liver core biopsy revealed StaGe 2 chronic hepatitis consistent with chronic hepatitis C infection.  *Id.*, Exhibit 1 (Kenney Decl.); Attachment H.  The report indicates that five or six core fragments with a combined length of 14 mm were evaluated.  The report also indicates that "at least 30 mm in [sic] recommended for optimal evaluation."  *Id.*  Dr. Kenny notes that IN order to make an objective accurate finding, the pathologist reviewing the liver biopsy requires an adequate tissue sample because theoretically, more cores from different parts of the liver would increase the chance of sampling tissue that might be affected differently than the tissue cores that were

REPORT AND RECOMMENDATION - 7

submitted for microscopic and histologic examination. Dr. Kenney opines that the cores

submitted from the March 9, 2012 biopsy were adequate and permitted the pathologist to

complete all necessary stains and examine the tissue microscopically.  The samples were uniform

and of sufficient quantity to make a firm finding of Stage 2 fibrosis.  It is Dr. Kenney's

experience that pathologists will request additional tissue samples in cases where they cannot

make a substantiable diagnosis.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 20.

On July 12, 2012, Dr. Smith and Nurse Eschbach met with Mr. Matter to

discuss any concerns he had with the Hep C CRC's recommendations.  The reason for initial

referral to Hep C CRC, the DOC Hepatitis C Protocol, his current level of fibrosis and the

Hep C CRC decision were discussed with him.  Mr. Matter verbalized his understanding and

disappointment.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 19; Attachment I.

## STANDARD OF REVIEW

The Court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a).  The moving party has the initial burden of production to demonstrate the absence

of any genuine issue of material fact.  Fed. R. Civ. P. 56(a); *see Devereaux v. Abbey,* 263 F.3d

1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, the moving party need not introduce

any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the

absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato

Johnson*, 212 F.3d 528, 532 (9th Cir.2000).  A nonmoving party's failure to comply with local

rules in opposing a motion for summary judgment does not relieve the moving party of its

affirmative duty to demonstrate entitlement to judgment as a matter of law.  *Martinez v.

Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

REPORT AND RECOMMENDATION - 8

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).  A court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified School Dist.,* 237 F.3d 1026, 1031 (9th Cir. 2001).  This is true even when a party appears *pro se*.  *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007).

## DISCUSSION

**A.    ADA Discrimination**

Title II of the ADA provides that: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Thus, the ADA prohibits public entities from discriminating against the disabled and from excluding the disabled from participating in or benefitting from a public program, activity, or service "solely by reason of disability." *Weinreich v. Los Angeles County Metro. Transp. Auth*., 114 F.3d 976, 978–79 (9th Cir. 1997) (*quoting Does 1–5 v. Chandler*, 83 F.3d 1150, 1155 [9th Cir. 1996]) (emphasis omitted).  If a public entity denies an

otherwise "qualified individual" "meaningful access" to its "services, programs, or activities" "solely by reason of" his or her disability, that individual may have an ADA claim against the public entity. *Weinreich*, 114 F.3d at 978–79 (*citing Alexander v. Choate*, 469 U.S. 287, 301–02, [1985] [internal citation omitted]).

The ADA defines a "qualified individual with a disability" to include anyone with a disability: "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); *Lee v. City of Los Angeles*, 250 F.3d 668, 692 (9th Cir. 2001).

The ADA broadly "defines 'public entity' as 'any State or local government [and] any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997) (quoting 42 U.S.C. § 12131(1)). This includes state prisons. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998); *Bogovich v. Sandoval*, 189 F.3d 999, 1002 (9th Cir. 1999). Specifically, the courts have stated that "although '[i]ncarceration itself is hardly a "program" or "activity" to which a disabled person might wish access,'" mental health services and other activities or services provided by correctional facilities to those incarcerated are "services, programs, or activities of a public entity" within the meaning of the ADA. *Armstrong*, 124 F.3d at 1023–24 (*quoting Crawford v. Indiana Dept. of Corrections*, 115 F.3d 481, 483 [7th Cir. 1997] (internal citation omitted) (alteration in original)); *see also Yeskey*, 524 U.S. at 209.

In order to state a claim under the ADA, Mr. Matter would have to show that he is a qualified individual for the purposes of receiving Hepatitis C treatment that is deemed

REPORT AND RECOMMENDATION - 10

1  medically necessary.  A "serious medical need" exists if the failure to treat a prisoner's

2  condition would result in further significant injury or the unnecessary and wanton infliction of

3  pain contrary to contemporary standards of decency.  *Helling v. McKinney*, 509 U.S. 25, 32-35

4  (1993); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992).

5      According to Dr. Kenney, Mr. Matter's liver biopsy produced a diagnosis of Stage 2

6  fibrosis and a mild to moderate fibrosis diagnosis which did not require further treatment.  Dkt.

7  28-8, Exhibit 1 (Kenney Decl.), Attachments F and H.  Mr. Matter has presented no evidence to

8  the contrary.  Therefore, Mr. Matter has failed to properly assert a claim for discrimination under

9  the ADA and it should be dismissed.

10

11 **B.     Discrimination under WLAD**

12      Mr. Matter also claims that Defendants' refusal to resume his treatment violates

13 Washington's law against discrimination.  However, his claim under RCW 49.60 is not

14 cognizable and must be dismissed.

15      WLAD, RCW 49.60, provides the right to be free from discrimination and also provides

16 a person who deems himself to be injured by any act in violation to have a civil action.  *See*

17 RCW 49.60.030.  The right to be free from discrimination extends to individuals who have been

18 diagnosed with Hepatitis C but only in the context of their employment.  *See* RCW 49.60.172.

19 WLAD does not present a free standing claim for allegations of discrimination.  In order

20 to have a WLAD claim, the individual must allege an unfair practice with respect to credit

21 transactions, insurance transactions, employers, labor unions or employment agencies.  *See*

22 RCW 49.60.175 through RCW 49.60.200.  An individual also has a claim under WLAD for

23 unfair practices with the respect to real estate transactions.  *See* RCW 49.60.222 through RCW

24 49.60.227.  In addition, an individual may make a claim of unfair practice related to a

25

26

REPORT AND RECOMMENDATION - 11

place of public resort, accommodation, assemblage, amusement for discrimination regarding the use of trained dog guides or service animals. *See* RCW 49.60.215.

None of Mr. Matter's allegations falls within any of these provisions and this claim should be dismissed.

**C.    Eighth and Fourteenth Amendment Claims**

Mr. Matter clams that he was denied constitutionally adequate medical care in violation of the Eighth and Fourteenth Amendments.  A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976).  A finding of deliberate indifference involves the examination of two elements:  (1) the seriousness of the prisoner's medical need and (2) the nature of the defendant's responses to that need. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller,* 104 F.3d 1133 (1997).  A "serious" medical need exists if the failure to treat a prisoner's condition could lead to further injury or the "unnecessary and wanton infliction of pain." *Id.* (citing Estelle, 429 U.S. at 104).  Examples of conditions that are "serious" in nature include an injury that a reasonable doctor or patient would find important and worthy of comment or treatment, a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain. *McGuckin*, 974 F.2d at 1060; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000).

If the medical needs are serious, the plaintiff must show that the defendants acted with deliberate indifference to those needs. *Estelle*, 429 U.S. at 104.  The plaintiff must demonstrate that the prison medical staff knew of and disregarded an excessive risk to her health. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970 (1994).  "Prison officials are deliberately indifferent

to a prisoner's serious medical needs when they 'deny, delay, or intentionally interfere with medical treatment'" or the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir.1992) (*overruled on other grounds*); *Hunt v. Dental Dept.*, 865 F.2d 198, 201 (9th Cir .1989) (citations omitted). In making such a showing, the plaintiff should allege a purposeful act or omission by the defendant. *McGuckin*, 974 F.2d at 1060.

Failure or refusal to provide medical care constitutes an Eighth Amendment violation only under exceptional circumstances that approach failure to provide care at all. *Shields v. Kunkel*, 442 F.2d 409, 410 (9th Cir. 1971). In addition, prison authorities have "wide discretion" in the medical treatment afforded prisoners. *Stiltner v. Rhay*, 371 F.2d 420, 421 (9th Cir. 1971). A plaintiff must show "more than a 'difference of medical opinion' as to the need to pursue one course of treatment over another …". *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.1996). A plaintiff must show that a course of treatment the doctors chose was medically unacceptable under the circumstances, and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to the plaintiff's health. *Id.* Similarly, a difference of opinion between a prisoner-patient and prison medical authorities regarding what treatment is proper and necessary does not give rise to an Eighth Amendment claim. *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970).

Viewing the record in the light most favorable to Mr. Matter, the facts demonstrate that Mr. Matter takes issue with the medical diagnosis and treatment (or lack thereof) provided to him by Defendants. However, there is no evidence that Defendants violated his Eighth or Fourteenth Amendment rights. The record reflects that the objective findings from the liver biopsy did not indicate that Mr. Matter's Hepatitis C warrants further treatment. Mr. Matter was diagnosed

REPORT AND RECOMMENDATION - 13

1   with Stage 2 fibrosis which, according to Dr. Kenney, is considered to be low to moderate and

2   does not require treatment.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 18; Attachment H.  Mr. Matter

3   provides no medical evidence to the contrary.

4           There is also no evidence that Defendants were deliberately indifferent to Mr. Matter's

5   medical needs.  Before he was referred to the Hep C CRC, Mr. Matter was interviewed,

6   examined, was given blood tests and mental health referrals to ensure all necessary information

7   was obtained to make a decision regarding his need for treatment.  *Id.*, Exhibit 1 (Kenney Decl.),

8   Attachments A-E.  Although Mr. Matter's pre-incarceration blood tests revealed Stage 3 or 4

9   fibrosis, a liver biopsy with microscopic evaluation of that biopsy is considered to provide a

10   more accurate and descriptive diagnosis than currently available blood test estimations of fibrosis

11   and therefore, the Hep C CRC determined that a liver biopsy was necessary to document

12   quantitatively the degree of liver fibrosis and assess rate of disease progression.  *Id.*, Exhibit 1

13   (Kenney Decl.), Attachment F.  Mr. Matter was sent to an outside provider to have the liver

14   biopsy and the results of that biopsy showed that Mr. Matter has Stage 2 fibrosis and did not

15

16

17   require further treatment.  *Id.*, Exhibit 1 (Kenney Decl.) (Kenney Decl.), Attachment H.

18           Mr. Matter does not contend that a Stage 2 fibrosis finding requires medical treatment.

19   Rather, he contends that the liver biopsy results were inaccurate because the pathologist noted at

20   least 30 mm of specimen was recommended for an optimal evaluation.  Dkt. 28-1, Exhibit 1

21   (Kenney Decl.), ¶ 20; Attachment H.  According to Dr. Kenney, the pathologist requires an

22   adequate tissue sample to make an objective accurate finding and the pathologist did so with the

23   tissue samples provided from Mr. Matter's March 9, 2012 biopsy.  Although the pathologist

24   noted in his report that 30mm of tissue is recommended for optimal evaluation, the cores

25

26   submitted did permit the pathologist to complete all necessary stains and examine the tissue

REPORT AND RECOMMENDATION - 14

microscopically.  According to the pathologist, the samples were uniform and of sufficient quantity to make a firm finding of Stage 2 fibrosis.  It is Dr. Kenney's experience that pathologists will request additional tissue samples in cases where they cannot make a substantiable diagnosis.  *Id.*, Exhibit 1 (Kenney Decl.), ¶ 20.  There is no evidence that the pathologist required additional tissue samples from Mr. Matter in order to make a firm finding of Stage 2 fibrosis.

Mr. Matter contends that he needs additional treatment but there is no evidence to indicate that failure to provide such treatment is medically unacceptable or that the Defendants have shown a conscious disregard of an excessive risk to his health.  To prevail on an Eighth Amendment medical claim, the Plaintiff must show "more than a 'difference of medical opinion' as to the need to pursue one course of treatment over another …."  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).  Mr. Matter must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to his health.  He has not done so.

There is also no medical evidence indicating that additional treatment would result in improvement of Mr. Matter's condition and according to Dr. Kenney, providing additional treatment could result in even more risks.  For example, lesser grades of fibrosis are unlikely to rapidly progress towards significant cirrhosis in the near term. For patients who have failed treatment previously or had a treatment regimen interrupted, retreatment or resuming treatment may prejudice the patient against a successful outcome at a later date with a more effective agent or different treatment regimen than is currently available. That is, multiple treatment failures reduce the expectation that treatment will be successful at any point with any agent. Since the disease is only very slowly progressive, it is wise to remain vigilant for any liver compromise

REPORT AND RECOMMENDATION - 15

1  and treat when the patient may gain maximum benefit from a treatment that by itself has

2  associated risks and adverse effects.  Dkt. 28-1, Exhibit 1 (Kenney Decl.), ¶ 9.

3         Because the record reflects that Defendants have provided medically acceptable care to

4  Mr. Matter at all times relevant to his complaint, Mr. Matter cannot show deliberate indifference.

5  Therefore, Defendants' motion for summary judgment should be granted and all Eighth and

6  Fourteenth Amendment claims against them dismissed with prejudice.

7  **D.     Personal Participation of Defendants**

8         In order to obtain relief against a defendant under 42 U.S.C. § 1983, a plaintiff must

9  prove that the particular defendant has caused or personally participated in causing the

10  deprivation of a particular protected constitutional right.  *Arnold v. IBM*, 637 F.2d 1350, 1355

11  (9th Cir. 1981); *Sherman v. Yakahi*, 549 F.2d 1287, 1290 (9th Cir. 1977).  To be liable for

12  "causing" the deprivation of a constitutional right, the particular defendant must commit an

13  affirmative act, or omit to perform an act, that he or she is legally required to do, and which

14  causes the plaintiff's deprivation.  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

15

16

17         The inquiry into causation must be individualized and focus on the duties and

18  responsibilities of each individual defendant whose acts or omissions are alleged to have

19  caused a constitutional deprivation.  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988); *see*

20  *also Rizzo v. Goode*, 423 U.S. 362, 370-71, 375-77 (1976).  Sweeping conclusory allegations

21  against an official are insufficient to state a claim for relief.  The plaintiff must set forth specific

22  facts showing a causal connection between each defendant's actions and the harm allegedly

23  suffered by plaintiff.  *Aldabe*, 616 F.2d at 1092; *Rizzo*, 423 U.S. at 371.

24

25         Further, Defendants in a 42 U.S.C. § 1983 action cannot be held liable based on a theory

26  of respondeat superior or vicarious liability.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981);

REPORT AND RECOMMENDATION - 16

1  *Bergquist v. County of Cochise*, 806 F.2d 1364, 1369 (9th Cir. 1986).  "At a minimum, a § 1983

2  plaintiff must show that a supervisory official at least implicitly authorized, approved, or

3  knowingly acquiesced in the unconstitutional conduct."  *Bellamy v. Bradley*, 729 F.2d 416, 421

4  (6th Cir. 1984), cert. denied, 469 U.S. 845 (1984).  A defendant cannot be held liable under

5  42 U.S.C. § 1983 solely on the basis of supervisory responsibility or position.  *Monell*, 436 U.S.

6  at 694; *Padway*, 665 F.2d at 965.  Vague and conclusory allegations of official participation in

7  civil rights violations are not sufficient.  *Pena*, 976 F.2d at 471.  Absent some personal

8  involvement by the defendants in the allegedly unlawful conduct of subordinates, they cannot

9  be held liable under § 1983.  *Johnson*, 588 F.2d at 743-44.

10      The record reflects that Mr. Matter has failed to allege the personal participation of

11  Defendants Goodenough, Glebe and Kenney.  There is no evidence showing that any of these

12  Defendants were involved in Mr. Matter's medical treatment or in making decisions relating to

13  that treatment.  Mr. Matter merely argues that these defendants should be held liable because

14  they reviewed his grievances.

15      Mr. Matter alleges that Defendant Goodenough is SCCC's Health Care Manager who

16  "reviews inmate grievances and has the authority to approve or deny the relief an inmate seeks

17  though the DOC grievance process that directly relates to medical concerns."  However, there is

18  no evidence that Mr. Goodenough has any medical decision making capabilities, that he was

19  involved in Mr. Matter's health care, or that his position is anything more than administrative.

20      Mr. Matter's claims against Defendant Glebe solely stem from his position as the

21  Superintendent.  He claims that in that capacity Defendant Glebe has the authority to approve or

22  deny the relief an inmate seeks through the grievance process.  However, there is no evidence

REPORT AND RECOMMENDATION - 17

1    that Defendant Glebe has the authority to direct offender medical care or that he was in anyway

2    involved in Mr. Matter's health care.

3           Defendant Kenney does have the education to make medical decisions but in Mr.

4    Matter's case, his role in Mr. Matter's grievance was limited to ensuring that procedurally (under

5    the Offender Health Plan and DOC policies), Mr. Matter's grievance was adequately investigated

6    and the concern or issue was addressed.  In this capacity, he does not have the authority to

7    approve or deny treatment.  Dkt. 28-1, Exhibit 1 (Kenney Decl.), ¶ 3.

8

9           Because Mr. Matter fails to make any specific showing demonstrating how these

10   Defendants participated in his medical treatment or making determination regarding his medical

11   treatment, dismissal of these defendants on lack of personal participation is also appropriate.

12   **E.     Qualified Immunity**

13          Defendants also argue that they are entitled to qualified immunity from damages.  Prison

14   officials are "shielded from liability for civil damages insofar as their conduct does not violate

15   clearly established statutory or constitutional rights of which a reasonable person would have

16   known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In analyzing a qualified immunity

17   defense, the Court must determine: (1) whether a constitutional right would have been violated

18   on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2)

19   whether the right was clearly established when viewed in the specific context of the case.

20   *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  "The relevant

21   dispositive inquiry in determining whether a right is clearly established is whether it would be

22   clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*.  In

23   analyzing a qualified immunity defense, courts are "permitted to exercise sound discretion in

24   deciding which of the two prongs of the qualified immunity analysis should be addressed first in

25

26

REPORT AND RECOMMENDATION - 18

light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

As noted above, the Court finds that Mr. Matter has failed to present a triable issue of fact as to his claims against Defendants and therefore, the Court need not further address the issue of qualified immunity.

### CONCLUSION

Based on the foregoing, the Court finds that Defendants' motion for summary judgment (Dkt. 28) should be **GRANTED** and all claims against them **dismissed with prejudice.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **August 29, 2014,** as noted in the caption.

**DATED** this  6th  day of August, 2014.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 19